William and Rita ESPEAIGNNETTE,
Plaintiffs, Appellants,

v.

GENE TIERNEY COMPANY,
INC., Defendant, Appellee.

No. 94–1258.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1994.

Decided Dec. 28, 1994.

Brian L. Lincicome with whom Cozen and O'Connor, Philadelphia, PA, Ted Susi, and Laney and Susi, Skowhegan, ME, were on brief, for appellants.

Roy E. Thompson, Jr. with whom Elizabeth G. Knox and Thompson & Bowie, Portland, ME, were on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Plaintiffs-appellants William and Rita Espeaignnette brought this action seeking damages for the loss of William Espeaignnette's lower right arm in an accident involving a lumber-mill saw designed and manufactured by defendant-appellee Gene Tierney, Inc. ("the Company"). Following a four-day trial, a jury returned a special verdict in favor of the Company, specifically finding that the saw was not defectively designed. The district court entered judgment for the Company and subsequently denied the Espeaignnettes' post-trial motions. The Espeaignnettes now appeal, assigning error to several of the district court's evidentiary rulings. Because we hold that the district court abused its discretion in excluding evidence pertaining to subsequent modifications made to the saw by Espeaignnette's [1] employer, we vacate the judgment and remand for new trial.

## I.

### Background

In 1990, Espeaignnette's employer, the Isaacson Lumber Company ("Isaacson"), purchased a Bottom Arbor Gang Saw, or "edger," designed and manufactured by the Company. Isaacson employs the edger to "square" or "edge" slabs of raw lumber. The edger operates in the following manner: First, the operator feeds slabs of raw lumber into the edger along a roller table, passing the slabs through anti-kick fingers that prevent the slabs from kicking back towards the operator as they contact the saw blades. After passing through the anti-kick fingers, powered infeed rollers grab the slabs and pull them into the saw blades. As designed and manufactured, the area surrounding the anti-kick fingers and the infeed rollers is open and not guarded by any physical covering.

The operator controls the edger from a station located at one end of the machine. During normal operation, there is no need for the operator to approach the open space near the anti-kick fingers and the infeed rollers, except to inspect or listen for strips of "edged" wood that occasionally "hang up" in the saw-blade area. When strips become stuck in this area, the operator must stop the machine and clear the work surface or risk damaging the saw blades.

Following installation of the machine, Espeaignnette was trained to operate the edger and subsequently ran it without incident for a period of two to three weeks. According to his trial testimony, on October 11, 1990, at approximately 10:30 p.m., Espeaignnette heard a noise that he thought indicated that a sliver of wood had become stuck in the sawblade section of the edger. At this point, Espeaignnette had been working for sixteen hours, with only a half-hour lunch break. Espeaignnette testified that he walked to the side of the edger, crouched down, and peered into the blades to investigate. Espeaignnette maintained that he did not stop the edger while investigating the noise because to do so would needlessly increase downtime, explaining that the edger often emitted similar sounds that, upon investigation, did not require a shutdown.

---

1. All references in the opinion to "Espeaign-    nette" refer solely to William Espeaignnette.

Espeaignnette testified that while he was crouched beside the edger, he saw a sliver of wood work free from the saw-blade area. He then attempted to stand up but, as he did so, lost his balance and stumbled towards the edger. He further testified that, as he stumbled, he reached out with his right hand to balance himself and inadvertently stuck his hand into the area of the infeed rollers, causing his right glove to become caught on a roller. As a result, his arm was crushed, pulled into the saw-blade area, and then severed below the right elbow.[2]

Following the accident, Isaacson continued to use the edger to cut raw lumber. In the summer of 1993, approximately six months before trial, an Isaacson employee modified the edger by welding to it a steel plate that covered the open area by the infeed rollers and the anti-kick fingers.

Espeaignnette tried this action against the Company solely on a theory of strict liability, alleging that the edger was defectively designed and unreasonably dangerous because of the lack of physical guards covering the infeed-roller area. As co-plaintiff, Rita Espeaignnette sought compensation for loss of consortium stemming from the injuries to her husband.

Prior to trial, the Company moved *in limine* to exclude all evidence pertaining to Isaacson's modification of the edger, and the Espeaignnettes similarly moved to exclude evidence about the absence of comparable accidents involving edgers designed by the Company. The district court provisionally granted the Company's motion and excluded the modification evidence pursuant to Fed. R.Evid. 407 as a subsequent remedial measure, subject, however, to the condition that the Company not controvert at trial the feasi-

bility of such a modification.[3] The court provisionally denied the Espeaignnettes' motion and, over objection, permitted the owner of the Company, Gene Tierney, to testify about the absence of reports of other accidents involving similar edgers designed by the Company.

During trial, the Espeaignnettes raised at least twice the issue of the subsequent-modification evidence. The district court declined to admit the evidence on each occurrence. Although eventually finding that the issue of feasibility had been clearly raised, the district court nonetheless excluded the evidence pursuant to Fed.R.Evid. 403 because the prejudicial impact of the evidence outweighed its probative value.[4] The Espeaignnettes made an offer of proof stating, *inter alia*, that they sought to call the current operator of the edger to testify that he had operated the edger both before and after its 1993 modification and that the modification had in no way inhibited the operation of the machine.

During trial, the district court also denied the Espeaignnettes' objections to the qualification of a witness for the Company as an expert in "industrial human factors" and to that witness's testimony concerning whether it was possible for Espeaignnette to have fallen into the edger as he alleged.

Following closing arguments, the district court submitted the case to the jury as a series of questions on a special-verdict form. The first question was whether the edger was "in a defective condition and unreasonably dangerous." The jury answered this question in the negative and, in accordance with the instructions on the form and the district court's oral instructions, proceeded no further. The jury did not answer the

---

2. The Company maintains that the accident occurred because Espeaignnette purposely, and not inadvertently, stuck his hand into the area of the infeed rollers to free a piece of wood.

3. Fed.R.Evid. 407 provides:
   When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent

measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

4. Fed.R.Evid. 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

subsequent questions on proximate cause and assumption of risk. Subsequently, the district court entered judgment for the Company and denied the Espeaignnettes' motions for judgment as a matter of law and a new trial. This appeal followed.

## II.

### Discussion

The Espeaignnettes assign error to three evidentiary rulings. They contend that the district court erred in (1) excluding under Rule 403 evidence concerning Isaacson's installation of the fixed metal guard on the edger, (2) admitting evidence concerning the absence of other accidents involving similar edgers designed by the Company, and (3) qualifying a witness for the Company as an expert in "industrial human factors" and permitting the witness to testify on that subject. We discuss each argument in turn.

### A. Subsequent Modification of the Edger

■ We begin by noting that a district court has considerable latitude in determining whether to admit or exclude evidence under Rule 403. *See, e.g., Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.,* 20 F.3d 15, 21 (1st Cir.1994). We review these rulings only for an abuse of discretion. *Daigle v. Maine Medical Ctr., Inc.,* 14 F.3d 684, 690 (1st Cir.1994). "'Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'" *Id.* (quoting *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1340 (1st Cir.1988)).

Our review, however, is not completely without bite. *See, e.g., Kassel v. Gannett Co.,* 875 F.2d 935, 951–52 (1st Cir.1989). In general, "[a]buse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988).

■ The Espeaignnettes argue that the district court abused its discretion in excluding pursuant to Rule 403 evidence regarding Isaacson's modification of the edger. Primarily, they contend that the district court incorrectly found that the danger of unfair prejudice outweighed the probative value of the evidence. The Espeaignnettes argue that the evidence was vital to establishing their prima facie case of strict liability under Maine law and that the district court vastly overestimated the danger of unfair prejudice. After a careful review of both the applicable law and the facts and circumstances surrounding this case, we agree.[5]

■ The Espeaignnettes tried their claim against the Company pursuant solely to Maine's strict liability statute.[6] Under the Maine statute, a plaintiff must prove that "the product was defectively designed thereby exposing the user to an unreasonable risk of harm." *Stanley v. Schiavi Mobile Homes, Inc.,* 462 A.2d 1144, 1148 (Me.1983). *See also St. Germain v. Husqvarna Corp.,* 544 A.2d 1283, 1285 (Me.1988). To determine whether a product was defectively designed, Maine

---

5. Because the district court excluded the evidence at trial pursuant to Rule 403, its pre-trial ruling excluding the evidence under Rule 407 as a subsequent remedial measure is not at issue. Nevertheless, because we are remanding the case for retrial, we note that circuit precedent clearly establishes that Rule 407 does not apply to actions taken by third parties such as Isaacson. *Raymond v. Raymond Corp.,* 938 F.2d 1518, 1524 (1st Cir.1991).

6. The Maine strict liability statute provides:
   One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.
   Me.Rev.Stat.Ann. tit. 14, § 221.

courts apply the "danger-utility" test. *St. Germain*, 544 A.2d at 1285. Under this test, proof of defective design includes "an examination of the utility of [the product's] design, the risk of the design and the feasibility of safer alternatives."[7] *Stanley*, 462 A.2d at 1148. *See also Walker v. General Elec. Co.*, 968 F.2d 116, 119 (1st Cir.1992).

■ In this case, the excluded evidence of the Isaacson modification tends to show that the design and installation of a physical guard was both possible and practical (i.e., placing a physical guard over the opening did not inhibit the operation of the edger). Moreover, this evidence bears directly on whether the edger was defectively designed. It allows the jury to compare the utility and risk of the edger as actually designed (without the guard) with the utility and risk of the alternate design (with the guard). Therefore, because the evidence was crucial to the Espeaignnettes' case, unless the danger of unfair prejudice substantially outweighed its probative value, the evidence should not have been excluded. *See Swajian v. General Motors Corp.*, 916 F.2d 31, 34–35 (1st Cir.1990)

(reversing exclusion under Rule 403 in products liability action where evidence bore directly on event in issue); *Laney v. Celotex Corp.*, 901 F.2d 1319, 1320–21 (6th Cir.1990) (reversing exclusion under Rule 403 where evidence "[went] to the fundamental question of the case"). *Cf.* Joseph W. Cotchett & Arnold B. Elkind, *Federal Courtroom Evidence* 93 (3d ed. 1993) ("If the party's case turns upon the introduction of the evidence, [Rule 403] favors the admission of the evidence.").

The fact that the court permitted the Espeaignnettes' expert to testify to the possibility of placing a physical guard on the edger does not diminish the probative value of the excluded evidence. The Company did not dispute the fact that it would have been theoretically possible to have installed a physical guard on the edger, but it did vigorously dispute whether such a guard would be practical. The designer of the edger, Gene Tierney, and the Company's expert witness, Professor Barnett, testified that a physical guard would unduly inhibit the normal operation of the edger.[8] The excluded evidence

---

7. In describing the feasibility prong of the danger-utility test, a leading authority explains that:

   [a]n alternative design that was not utilized is to be considered as feasible when a reasonable person would conclude that the (1) magnitude of the danger-in-fact that could have been avoided by such alternative design in the (2) utilization of the scientific technological know-how reasonably available to the defendant outweighed the (1) financial costs of guarding against such avoidable danger, (2) *the impairment of the benefits*, and (3) any new danger-in-fact that would have been created by the alternative design.

   W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 99 at 700 (5th ed. 1984) (emphasis supplied). *Cf. St. Germain*, 544 A.2d at 1285–86 (evidence "that the safety feature would minimally impair the use of the saw" supported determination that evidence was sufficient to find a defective condition and that, consequently, the trial court had erred in directing verdict for manufacturer on strict liability claim).

8. Answering why he chose not to include a physical guard over the open area of the edger where Espeaignnette was injured, Tierney testified:

   Utility of the machine. I have found, almost without exception, that where you have a guard bolted on, hinged, pinned on, even clipped, they'll take it off first time and it stays

off. Then you have that whole opening exposed.
   Q. You didn't put a guard because you were afraid someone would take it off?
   A. I'm saying you use the utility of that machine, how long do you anticipate it would take to take the guard off assuming they did put it back? What would that—
   Q. I'm sorry. Go ahead.
   A. What would that do to operator stress when his material is piling up on him. That's going to make him fight it, so to speak, to catch up. He's more prone to error under those conditions. All those factors are considered.
   Professor Barnett testified:
   The methodology of trying to get that thing unjammed is simply horrific, and we need every aperture available to us.

   .    .    .    .    .

   *Put those guards on the side, if they're permanently fixed on there, you have now seriously compromised the unjamming capability of the machine.* If you don't put them on permanently, then the task will be we have to remove them so we can get in there and do the unjamming on the side. If you remove them, then the machine is right back to the one we're looking at in the front of the room.
   (Emphasis supplied). In his opening remarks, the Company's counsel stated:
   One of the reasons, you will learn, that there is an opening in this very area is *it is mandato-*

tends to show directly that a physical guard does not inhibit the operation of the edger and therefore would have rebutted the testimony of Tierney and Professor Barnett much more effectively than hypothetical assertions by the Espeaignnettes' expert witness.

Not only did the district court incorrectly gauge the probative value of the testimony, it also overestimated the danger of unfair prejudice. It is, of course, axiomatic that "[a]ll evidence is meant to be prejudicial; elsewise, the proponent would be unlikely to offer it." *Daigle*, 14 F.3d at 690. The appropriate inquiry under Rule 403, therefore, is whether the evidence results in "unfair prejudice." *See Swajian*, 916 F.2d at 34. " 'Unfair prejudice' ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 advisory committee's note.

In its final trial ruling, the district court excluded the evidence, reasoning only that:

the prejudicial impact of that evidence as it relates to Isaacson correcting the machine or having the machine corrected, the prejudicial impact of that evidence outweighs the probative value of it because the jury may very well infer from that activity that that was—they may take that evidence as evidence of negligence or product liability on the part of the defendant rather than evidence for which it is intended; namely, the feasibility of putting that or making that repair on the machine.

■ The district court viewed the evidence as admissible (if at all) only to show feasibility under an exception to Rule 407. Therefore, in weighing the prejudicial impact of the evidence, the court examined whether it would tend to show something more than just feasibility (e.g. negligence or product liability). As noted, however, because a third party, and not the Company, modified the edger, the evidence of the modification was not subject to exclusion under Rule 407. *See supra* note 5. Therefore, the fact that the Espeaignnettes' proffered evidence may have tended to show "negligence or product liability" rather than just feasibility did not, by itself, constitute an improper use of the evidence and warrant its exclusion as unfairly prejudicial under Rule 403.

Moreover, once the analysis is conducted outside the Rule 407 framework, we do not believe that the excluded evidence posed any significant risk of unfair prejudice. The Isaacson modification was not a subsequent design developed well after the edger was manufactured. Hence, it was not (arguably) misleading or unfairly prejudicial on the issue of whether the edger was unreasonably dangerous at the time of manufacture. *See, e.g., Grenada Steel Indus., Inc. v. Alabama Oxygen Co.*, 695 F.2d 883, 889 (5th Cir.1983) (design changes *developed* after the manufacture of the product in question are irrelevant to the reasonableness of the design at the time of manufacture). True, Isaacson did not install a guard on the edger until more than two years after the accident. The Company, however, does not contend that a guard could not have been installed at the time of manufacture or even that the installation was not considered. Therefore, the Espeaignnettes' proffered evidence would not have introduced design choices not known or feasible at the time of manufacture.

Furthermore, the Company's failure in its brief to illustrate how the excluded evidence

ry that there be access to do just what [the Espeaignnettes' counsel] indicated, and that is unjam, unplug what can happen in there. There is a necessity to look in that area and to, once the machine is turned off, reach in and unplug it.

(Emphasis supplied). In addition, the Company's counsel argued at closing:

This machine had to be designed to keep this downtime to a minimum.

.  .  .  .  .

And I want you to think just for a moment about some testimony relative to the jams when the slab goes in and gets really hung up in those rollers. (Gesturing) To get that slab out, you're going to have to go into the area between the in-feed rollers and the kickback fingers.

If you open up the machine and go in this way, you're only getting one end of it. You're not getting the major jam, which is where—the in-feed rollers and the antikickback fingers. *You had to have access in that area.* (Emphasis supplied). *Cf. Borden, Inc. v. Florida East Coast Ry. Co.*, 772 F.2d 750, 756 (11th Cir.1985) ("[A] litigant is unduly prejudiced when his opponent is successful in preventing the admission of evidence on a particularly crucial issue in dispute, and then points to the absence of such evidence in closing argument.")

would be "unfairly" prejudicial to its case confirms our conclusion. The Company argues only that the testimony would have been confusing and misleading to the jury because the guard installed by Isaacson was a different type of guard (a permanent guard) than the guard recommended by the Espeaignnettes' expert (a removable guard). Though this is a difference, we cannot say that it is particularly confusing or unfairly prejudicial.

In sum, the proffered evidence posed no significant risk of unfair prejudice.[9]

Nevertheless, we remain mindful of the substantial deference that is properly accorded to a district court's judgment in " 'steadying the Rule 403 seesaw.' " *Kassel*, 875 F.2d at 952 (quoting *Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir.1987). The question is not whether we would strike the balance differently in the first instance, but whether the balance actually struck is so egregiously one-sided that it requires reversal. Our decision in *Swajian v. General Motors Corp.*, 916 F.2d 31 (1st Cir.1990), in which we reversed a district court's decision in a products liability action to exclude evidence pursuant to Rule 403, informs our analysis on this issue.[10]

In *Swajian*, the plaintiff's wife was killed when a truck she had been driving rolled over in an accident. The plaintiff contended that the truck's rear axle was defective and had caused the accident. General Motors argued, however, that driver error was the cause. The district court excluded evidence that the decedent had been drinking prior to the accident, finding that the evidence was "unduly inflammatory" and that its prejudicial impact would far outweigh its probative value. *Id.* at 34.

On appeal, we reversed, criticizing the district court for its failure in striking the Rule 403 balance to distinguish between evidence that is prejudicial and evidence that is *unfairly* prejudicial. *Id.* at 35. Moreover, we stressed that the evidence was highly probative because it bore directly on the issue of causation. *Id.*

As in *Swajian*, the evidence excluded here bore directly on an essential element of the plaintiff's prima facie case. Furthermore, as compared to the circumstances of this case, we think that the risk of unfair prejudice in *Swajian* was decidedly more pronounced. In *Swajian*, a real danger undoubtedly existed that the jury would have taken the evidence of the decedent's drinking as showing that she was at fault and not entitled to compensation, regardless of whether or not the axle failure caused the accident. In contrast, as we have explained above, the evidence excluded in this case posed little, if any, risk of *unfair* prejudice.

In sum, we are convinced that the excluded evidence was highly probative on an essential disputed element in the case and that the danger of unfair prejudice was extremely remote. Accordingly, we hold that the district court abused its discretion in excluding the proffered evidence.[11]

9. We also note that in its provisional ruling before trial, the district court excluded the evidence under Rule 407, but added, "I am more concerned, frankly, with prejudicial impact that that kind of evidence would have on the jury; specifically, that portion of the evidence which indicates that the same machine, at the same place, in the same factory, was in fact remedied to prevent this kind of accident." The district court did not reiterate this reasoning when it excluded the evidence under Rule 403. In any event, we are unconvinced that the fact that the evidence concerned the specific edger involved in the accident evokes any special degree of *unfair* prejudice in this case.

10. Even though *Swajian* suggests that, there, the district court erred as a matter of law by not making a specific finding of "unfair prejudice," the opinion is best interpreted as holding that the district court abused its discretion in conducting the balancing that Rule 403 requires. This can be deduced from the *Swajian* panel's review of the district court's balancing of probative value against prejudicial impact, *Swajian*, 916 F.2d at 34, which, in turn, supports a conclusion that the district court abused its discretion in striking the balance in this case.

11. We further note that the cases on which the Company relies to support excluding the evidence are clearly distinguishable. *See Harrison v. Sears, Roebuck & Co.*, 981 F.2d 25, 31–32 (1st Cir.1992) (negligence and breach of warranty action, evidence offered to impeach only); *Raymond*, 938 F.2d at 1523–24 (feasibility stipulated and design modification developed after manufacture of product); *Grenada Steel*, 695 F.2d at 888–89 (feasibility clearly not contested and de-

Our determination that the district court abused its discretion in striking the Rule 403 balance does not, however, end our analysis. As with most trial errors, we are not empowered to notice error in a district court's evidentiary ruling "unless a substantial right of the party is affected." Fed.R.Evid. 103(a); *see also* Fed.R.Civ.P. 61. In determining whether an error affected a party's substantial right, "[t]he central question is whether this court can say with fair assurance ... that the judgment was not substantially swayed by the error." *Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 46 (1st Cir.1991) (internal quotations omitted).

■ The exclusion of the proffered testimony cannot be considered harmless. As noted, the evidence directly pertains to whether the edger was unreasonably dangerous at the time of manufacture. Therefore, we cannot say that its absence did not substantially affect the jury's decision on this point.

Furthermore, the only issue the jury considered was whether the edger was unreasonably dangerous. In accord with the court's instructions, the jury returned a single finding that the edger was not "in a defective condition and unreasonably dangerous." The jury did not answer the subsequent questions on the special-verdict form concerning proximate cause and assumption of risk. As a result, because the exclusion of the evidence undermined the jury's sole finding that the edger was not in a defective condition, it therefore affected a substantial right of the Espeaignnettes.

### B. Absence of other accidents

The Espeaignnettes contend that the district court erred in admitting evidence concerning the lack of similar accidents involving edgers designed by the Company. The Espeaignnettes argue that this evidence is irrelevant in a strict liability action and, in the alternative, that the Company failed to establish a proper foundation for the evidence. The Espeaignnettes fail on both grounds.

■ As an initial matter, we note that both parties argued this issue before the

district court and in their briefs as though it were controlled by state law. Neither side discussed the applicability of the Federal Rules of Evidence. Nevertheless, it is axiomatic that in determining whether evidence is *relevant,* and therefore admissible in a diversity action, the Federal Rules of Evidence supply the appropriate rules of decision. *See, e.g., McInnis v. A.M.F., Inc.*, 765 F.2d 240, 245–46 (1st Cir.1985); Fed.R.Evid. 1101. Normally, the Espeaignnettes' failure to argue the correct applicable standard would effect a waiver of the issue. Because we are remanding the issue for retrial, however, we will proceed to discuss the issue as it arises under the Federal Rules of Evidence.

Subject to certain limitations, all evidence is admissible if it is relevant—i.e., if it tends to make the existence or nonexistence of a disputed fact "more probable than it would be without the evidence." Fed.R.Evid. 401, 402. As we have discussed earlier, a district court may nonetheless exclude relevant evidence if the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403.

■ In general, courts have recognized that the absence of prior accidents may be admissible to show:

(1) absence of the defect or other condition alleged,

(2) the lack of a causal relationship between the injury and the defect or condition charged, [and]

(3) the nonexistence of an unduly dangerous situation.

Strong, 1 *McCormick on Evidence* § 200 at 850–51. Moreover, we recently rejected the argument that evidence of the lack of prior accidents is irrelevant on the issue of causation in a products liability case brought on a negligence theory. *Harrison v. Sears, Roebuck & Co.*, 981 F.2d 25, 30 (1st Cir.1992). *See also Keller v. United States*, 38 F.3d 16,

sign changes developed years after manufacture    of product).

29, 30 (1st Cir.1994) (noting evidence of the absence of other accidents as supporting district court's failure to find design defect or causation in negligence case).[12]

■ The evidence of the absence of prior accidents is clearly relevant to several disputed issues in this case. The fact that the Company had received no reports of similar accidents tends to disprove causation. That there were no similar reports of injuries due to inadvertent contact with the infeed rollers tends to support the Company's contention that it was not possible for Espeaignnette to have stumbled accidentally into the open area of the edger as he alleged. Additionally, the absence of prior accidents is probative and relevant to whether the edger as designed was unreasonably dangerous.

■ The Espeaignnettes alternatively contend that the Company failed to establish the necessary foundation for admission of the evidence. A review of the cases reveals, for the most part, that evidence of the absence of prior accidents may not be admitted unless the offering party first establishes that the "lack of accidents was in regard to products that are substantially identical to the one at issue and used in settings and circumstances sufficiently similar to those surrounding the machine at the time of the accident." *Klonowski v. International Armament Corp.,* 17 F.3d 992, 996 (7th Cir.1994) (internal quotations omitted). Whether such preliminary requirements are aimed at preventing the admission of irrelevant evidence under Rule 402, excluding relevant evidence that is unfairly prejudicial and confusing under Rule 403, or both, is unclear. *Cf. Fusco v. General Motors Corp.,* 11 F.3d 259, 264 (1st Cir.1993) (foundational requirement of substantial similarity regarding evidence of similar accidents "now loosely appended to Rule 403"). In any event, the determination of admissibility turns on the facts and circumstances of each case and is committed, in the first instance, to the sound discretion of the district judge. *See United States v. Brandon,* 17 F.3d 409, 444 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 34, *and cert. denied,* —— U.S. ——, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994); Fed.R.Evid. 104(a).

■ Prior to testifying about the lack of similar accidents, Tierney testified that, since 1976, his company had sold eighty-seven edgers using essentially the same open infeed-roller design. He also testified that as president of the Company any claims or notices of accidents involving an edger designed and manufactured by the Company would have come to his attention. While in different circumstances a district court might require more to show sufficient similarity, we think that Tierney's testimony established that the evidence of the absence of other accidents was admissible in this case. Furthermore, we note that the Espeaignnettes' counsel soundly attacked this testimony during cross-examination, bringing out that Tierney did not know whether any of the machines had been modified or if they had been situated so as to prevent accidental contact with the infeed rollers.

## C. Expert testimony

The Espeaignnettes' final complaint is that the district court improperly permitted the Company's expert witness to testify that it was not physically possible for Espeaignnette to stumble and fall into the edger as he contended. Specifically, the Espeaignnettes contend that the Company's expert lacked sufficient qualifications to testify as an "industrial human factors" expert in machine design. They further argue that the subject of the testimony—how one reacts during a stumble—was an improper subject for expert testimony because it was within the knowledge of the average juror. We do not agree.

■ Determinations of whether a witness is sufficiently qualified to testify as an expert on a given subject and whether such expert

---

**12.** The Espeaignnettes argue, however, that even if the absence of prior accidents would be relevant in a negligence case, the district court should still have excluded the evidence because the issue here turns solely on principles of strict liability. This argument is not persuasive because the Maine Supreme Judicial Court has recognized that negligence and strict liability causes of action both share the same elements of causation and defective design. *See Marois v. Paper Converting Mach. Co.,* 539 A.2d 621, 623 (Me.1988) (causation) *and Stanley,* 462 A.2d at 1148 (defective design).

testimony would be helpful to the trier of fact are committed to the sound discretion of the trial court. *See, e.g., Navarro de Cosme v. Hospital Pavia,* 922 F.2d 926, 931 (1st Cir. 1991). "[A] trial judge's rulings in this sphere should be upheld 'unless manifestly erroneous.'" *United States v. Sepulveda,* 15 F.3d 1161, 1183 (1st Cir.1993) (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *but compare Williams v. Poulos,* 11 F.3d 271, 282 (1st Cir.1993) (stating standard of review is abuse of discretion).

■ A review of Professor Barnett's vita and testimony reveals that, although he has little formal education regarding "industrial human factors," he does have extensive professional experience in the field. His testimony was not restricted to how a person reacts during a stumble. Rather he gave important testimony explaining human interaction with machines, an issue both important in evaluating the Company's decision not to place a physical guard on the edger and relevant to the Company's theory of causation. The district court did not abuse its discretion in either accepting the qualifications of Professor Barnett as an expert or admitting his testimony.

### III.

### Conclusion

For the foregoing reasons, we vacate the judgment entered below and remand this case to the district court for a new trial.