<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1163

                JULIO ELVIN RUIZ-TROCHE, ET AL.,

                     Plaintiffs, Appellees,

                               v.

      PEPSI COLA OF PUERTO RICO BOTTLING COMPANY, ET AL.,

                    Defendants, Appellants.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

      [Hon. Raymond L. Acosta, Senior U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
                Aldrich, Senior Circuit Judge,
                                
                  and Boudin, Circuit Judge.
                                

    Stephen A. Cozen with whom Elizabeth J. Chambers, Cozen and
O'Connor, Francisco J. Coln-Pagn, Francisco E. Coln-Ramrez, and
Coln, Coln & Martinez were on brief, for appellants.
    Jos F. Quetglas Jordan and Jorg Carazo-Quetglas, with whom
Eric M. Quetglas Jordan, Quetglas Law Offices, and Toledo Toledo &
Carazo-Quetglas, P.C. were on brief, for appellees.

December 1, 1998

 SELYA, Circuit Judge.  This appeal requires us to explore
the limits of a trial court's authority to exclude scientific
evidence   in this instance, evidence of alleged cocaine use by the
driver of a motor vehicle involved in a fatal accident and evidence
of his ensuing impairment   under Daubert v. Merrell Dow Pharm.,
Inc., 509 U.S. 579 (1993).  We conclude that the court below abused
its discretion in excluding certain of this evidence and that the
magnitude of the error necessitates a new trial.
I.  BACKGROUND
 On an afternoon in September of 1992, Julio Elvin Ruiz
Cintrn (Ruiz) was driving a Toyota automobile westerly along a
two-lane road in Puerto Rico.  At what proved to be the critical
moment, Ruiz left his lane to pass a slow-moving vehicle.  Seconds
later, his car collided with an oncoming eastbound tractor-trailer
rig.  Ruiz, his wife, son, and three other passengers (all minors)
were killed.  Ruiz's four-year-old daughter survived, but sustained
permanent brain damage.
 In due course, Ruiz's daughter, joined by other relatives
of the various decedents (all of whom, at the time of suit, were
citizens of mainland states), invoked diversity jurisdiction, 28
U.S.C.  1332(a), and brought suit for damages in Puerto Rico's
federal district court.  They named as defendants the driver of the
tractor-trailer unit, Juan Hernndez Rosario (Hernndez); his
employer, Los Vaqueros de Transporte y Carga; the consignor,  Pepsi
Cola of Puerto Rico Bottling Company; and several insurers.  The
plaintiffs averred (1) that Hernndez needlessly accelerated his
rig as the Toyota approached, thereby shortening the available time
within which Ruiz could complete his passing maneuver and return to
his own side of the road, and (2) that Hernndez refused to veer to
the right to avoid the accident, despite having sufficient space
and time to do so.  The defendants denied the essential allegations
of the complaint.  They argued that Ruiz, and Ruiz alone, had
caused the accident by recklessly initiating a passing maneuver in
the face of obvious danger and placing his vehicle on the wrong
side of the road.  To bolster this thesis, the defendants sought to
show that cocaine intoxication provoked Ruiz's recklessness.
 The district court stymied the defendants' anticipated
trial strategy by refusing to admit into evidence either the
toxicology section of the autopsy report (which reflected the
presence of cocaine and cocaine metabolites in Ruiz's bloodstream)
or expert testimony regarding the significance of these findings.  
In the court's view, the proposed expert testimony failed to meet
the standard of reliability required under Daubert.  Having
rejected the expert testimony, the court then excluded the
toxicology results under Fed. R. Evid. 403, concluding that those
results, standing alone and unexplained, were more prejudicial than
probative.
 In diversity cases, local law provides the substantive
rules of decision.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78
(1938); Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 689 (1st Cir.
1994).  Puerto Rico law recognizes comparative negligence
principles.  See P.R. Laws Ann. tit. 31,  5141 (1990).  The trial
judge instructed accordingly, and the jury found both drivers
negligent, assigning 59% of the fault to Ruiz and 41% to Hernndez.  
It then awarded damages totaling approximately $13,000,000 to the
various plaintiffs.  Due to Puerto Rico's combination of
comparative negligence and joint and several liability rules, the
defendants will be required to pay the full amount of these damages
if the judgment becomes final.
    In the aftermath of the jury verdict, the defendants
moved for judgment as a matter of law, Fed. R. Civ. P. 50, or,
alternatively, for a new trial, Fed. R. Civ. P. 59.  The district
court rejected the defendants' plaints, including those that
centered on the allegedly wrongful exclusion of the expert
testimony and toxicology results.  This appeal ensued.
II.  DISCUSSION
    The Daubert questions in this case are complex and
implicate four interrelated pieces of evidence:  (1) the toxicology
results contained in the autopsy report; (2) the so-called "dosage"
testimony, i.e., the expert opinions of a pharmacologist relating
to the amount of drugs that Ruiz consumed and the time of their
consumption, arrived at by interpolation from the toxicology
results; (3) the so-called "impairment" testimony, i.e., the
pharmacologist's expert opinions regarding the effects of cocaine
on behavior; and (4) the so-called "causation" testimony, i.e.,
certain expert opinions of the defense's accident
reconstructionist.  After surveying the legal landscape, we discuss
how these items came before the district court and how the court
handled them.  We then explicate the standard of review and proceed
to test the correctness of the district court's rulings.
                     A.  Daubert Revisited.
    The Evidence Rules generally confine the testimony of a
lay witness to matters about which he or she has personal
knowledge, see Fed. R. Evid. 602, although such a witness may offer
opinions that are "rationally based on [his or her] perception" and
"helpful to a clear understanding of the witness' testimony or the
determination of a fact in issue," Fed. R. Evid. 701.  The Rules
afford expert witnesses much more leeway.  "If scientific,
technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience,
training, or education, may testify thereto in the form of an
opinion or otherwise."  Fed. R. Evid. 702.  Despite its apparent
breadth, this language does not give experts carte blanche, but,
rather, envisions some regulation of expert testimony by trial
judges.  The Court's opinion in Daubert furnishes the principal
source of guidance on the proper fulfillment of this gatekeeping
role.
    We start with an historical perspective.  Prior to
Daubert, courts and commentators regarded Frye v. United States,
293 F. 1013 (D.C. Cir. 1923), as the watershed case on the
admission of expert opinion testimony.  Under Frye, the
admissibility of an expert opinion or technique turned on its
"general acceptance" vel non within the scientific community.  Id.at 1014.  Daubert tackled the question of whether the Frye standard
survived the passage of the Federal Rules of Evidence (and, in
particular, Rule 702) and answered that question in the negative,
holding that Rule 702 displaced the Frye test.  See Daubert, 509
U.S. at 587-89.
    The Daubert Court's interpretation of Rule 702, drawn
from its text, requires the trial judge to evaluate an expert's
proposed testimony for both reliability and relevance prior to
admitting it.  See id. at 589-95.  The requisite review for
reliability includes consideration of several factors:  the
verifiability of the expert's theory or technique, the error rate
inherent therein, whether the theory or technique has been
published and/or subjected to peer review, and its level of
acceptance within the scientific community.  See id. at 593-95.  
The Court reasoned that due investigation of such matters will
ensure that proposed expert testimony imparts "scientific
knowledge" rather than guesswork.  Id. at 592.  Withal, the factors
that the Court enumerated do not function as a "definitive
checklist or test," but form the basis for a flexible inquiry into
the overall reliability of a proffered expert's methodology.  Id.at 593.
    Along with the reliability requirement, the Daubert Court
imposed a special relevancy requirement.  See id. at 591-92.  To be
admissible, expert testimony must be relevant not only in the sense
that all evidence must be relevant, see Fed. R. Evid. 402, but also
in the incremental sense that the expert's proposed opinion, if
admitted, likely would assist the trier of fact to understand or
determine a fact in issue, see Daubert, 509 U.S. at 591-92.  In
other words, Rule 702, as visualized through the Daubert prism,
"requires a valid scientific connection to the pertinent inquiry as
a precondition to admissibility."  Id. at 592.
    In General Elec. Co. v. Joiner, 118 S. Ct. 512 (1997),
the Justices established the appropriate standard of appellate
review for Daubert determinations, concluding that a reviewing
tribunal should scrutinize a trial court's decision to allow or
disallow the admission of expert testimony on Daubert grounds for
abuse of discretion.  See id. at 517.  Joiner also placed a gloss
on Daubert's insistence that trial courts focus on an expert's
methodology, rather than his conclusions, in order to determine the
reliability of his testimony.  See Daubert, 509 U.S. at 595.  The
Joiner Court moderated this position, acknowledging that
    conclusions and methodology are not entirely
    distinct from one another.  Trained experts
    commonly extrapolate from existing data.  But
    nothing in either Daubert or the Federal Rules
    of Evidence requires a district court to admit
    opinion evidence which is connected to
    existing data only by the ipse dixit of the
    expert.  A court may conclude that there is
    simply too great an analytical gap between the
    data and the opinion proffered.

Joiner, 118 S. Ct. at 519.  Thus, while methodology remains the
central focus of a Daubert inquiry, this focus need not completely
pretermit judicial consideration of an expert's conclusions.  
Rather, trial judges may evaluate the data offered to support an
expert's bottom-line opinions to determine if that data provides
adequate support to mark the expert's testimony as reliable.
    Daubert and Joiner, though critically important, do not
represent the sum total of available jurisprudential insights.  
Since Daubert hove into view, the courts of appeals have made
significant contributions to an understanding of how to separate
reliable from unreliable science and how to apply the intuitive
idea of "fit"   as courts have come to call the special kind of
relevance that Daubert demands   to live litigation scenarios.  
See, e.g., Baker v. Dalkon Shield Claimants Trust, 156 F.3d 248,
252-54 (1st Cir. 1998); Daubert v. Merrell Dow Pharm., Inc., 43
F.3d 1311, 1316-22 (9th Cir. 1995).  Nonetheless, choreographing
the Daubert pavane remains an exceedingly difficult task.  Few
federal judges are scientists, and none are trained in even a
fraction of the many scientific fields in which experts may seek to
testify.  Moreover, even though Daubert and its progeny require
trial judges to evaluate the level of support provided by complex
scientific studies and experiments in myriad disciplines,
reliability and relevance remain legal judgments.  Trial judges
cannot abdicate the responsibility for making those judgments by
delegating them to the scientific community.
    To complicate matters further, Daubert issues rarely
arise in a vacuum, but, rather, frequently collide in practice with
the requirements of other rules of evidence, especially Fed. R.
Evid. 403.  This phenomenon adds yet another dimension to the
decisional calculus.  See, e.g., Baker, 156 F.3d at 254.
                  B.  The Challenged Evidence.
    We turn now from the general to the particular, and
canvass the evidence tendered below insofar as it bears on this
appeal.  Following Ruiz's death, the authorities ordered an
autopsy.  The autopsy report included toxicology results indicating
that Ruiz's body contained 0.45 mcg/ml of cocaine and 0.15 mcg/ml
of a cocaine metabolite (benzoylecgonine) in its blood, cocaine
metabolites in its urine and vitreous humor, and cocaine in its
nasal passages.  The defendants proffered Dr. James O'Donnell, a
well-credentialed pharmacologist, to comment upon the significance
of these findings.  Dr. O'Donnell was prepared to testify, based on
the autopsy report, that in his opinion Ruiz had snorted 200
milligrams of cocaine within an hour prior to the accident.  Dr.
O'Donnell also proposed to testify that cocaine impairs senses and
capabilities affecting driving, diminishes perception, and
increases the willingness to take risks.  The district court
excluded not only Dr. O'Donnell's testimony, but also the
toxicology results.  And, though the court permitted the
defendants' accident reconstruction expert, Eric Cintrn, to
testify, the court apparently precluded counsel from eliciting his
opinion that Ruiz would not have initiated the fateful passing
maneuver had it not been for his cocaine intoxication.

                     C.  Proceedings Below.
    The evidentiary issues in this case came to the fore on
February 28, 1997, when the plaintiffs filed motions in limine
seeking the exclusion of both Dr. O'Donnell's testimony and the
toxicology results.  The plaintiffs argued that levels of cocaine
and metabolites in the bloodstream could not be correlated to
initial dosage or levels of impairment with the degree of certainty
required for scientific evidence, and they produced several
articles to this effect.  They sought exclusion of the toxicology
results mainly on the theory that the chain of custody of the
samples of bodily fluids had been compromised.  The defendants
promptly submitted an opposition.  They proffered Dr. O'Donnell's
report, the report of the plaintiffs' expert toxicologist
(suggesting that he used a methodology similar to that employed by
Dr. O'Donnell), and portions of plaintiffs' expert's deposition.  
Based on these materials, they argued that Dr. O'Donnell's
methodology was sufficiently reliable to withstand Daubertscrutiny.  As to the toxicology results, the defendants contended
that the plaintiffs' argument was factually wrong, and that, in all
events, any gaps in the chain of custody went to the weight of the
evidence, not to its admissibility.  See, e.g., United States v.
Ladd, 885 F.2d 954, 956 (1st Cir. 1989).
    The district court held a pretrial conference on March 5,
1997.  At the court's request, defense counsel agreed to furnish
copies of the 18 articles cited by Dr. O'Donnell in his report, and
submitted 14 of them within the next few days.  Without waiting for
the remainder, the district court ruled on March 10.  It concluded
that there was "no scientific basis" for Dr. O'Donnell's dosage
opinion (i.e., his opinion that Ruiz had snorted at least 200 mg of
powdered cocaine within an hour before the accident) and that Dr.
O'Donnell's impairment opinion (i.e., his opinion that cocaine
ingestion had impaired Ruiz's driving ability) likewise failed to
pass the Daubert reliability screen.  To close the circle, the
court barred introduction of the toxicology results "in light of"
the exclusion of Dr. O'Donnell's testimony.
    Trial began the next day.  On March 26, the plaintiffs
moved in limine to exclude the testimony of Eric Cintrn.  Noting
a statement in Cintrn's report to the effect that Ruiz "appears to
have been driving under the influence of drugs as it is evidenced
by the toxicological report," and his conclusion that "this may
explain the reason for [the] . . . passing maneuver," the
plaintiffs argued for exclusion both because the trial court had
banished the toxicology results and because Cintrn was unqualified
to opine on the relationship between cocaine and driving ability.  
Although the district court never formally ruled on this motion,
Cintrn was not asked his opinion on these matters when he
testified, and the parties treat this omission as flowing from the
district court's prohibition on any mention of the toxicology
results.
    On March 31   the same day that the plaintiffs completed
their case in chief   the defendants filed a motion to admit Dr.
O'Donnell's testimony and attached to it copies of numerous
additional articles and portions of learned treatises regarding
cocaine's absorption, excretion, detection in bodily fluids, and
effects on the senses and behavior.  Judge Acosta denied the motion
the following day, terming it "untimely."  Other motions for
reconsideration, made at divers points during the presentation of
the defense's case, met a similar fate.
                    D.  Standard of Review.
    Nobody questions that testimony regarding dosage   what
quantity of drugs Ruiz consumed, and when   and the effect of
Ruiz's cocaine consumption on his driving ability would be relevant
as long as it could be reliably determined that Ruiz ingested an
appreciable amount of cocaine shortly before the accident and that
such dosage probably would impair one's ability to drive.  Thus,
although the Daubert standard requires that expert testimony be
both reliable and relevant as a precondition to admissibility, the
reliability inquiry is central in this case.
    The district court concluded that Dr. O'Donnell's
testimony on both dosage and impairment lacked scientific
reliability and precluded the testimony on that basis.  Forbidding
the toxicology results and Cintrn's opinion on causation followed
directly from this exclusionary ruling.  We review all these
determinations for abuse of discretion.  See Joiner, 118 S. Ct. at
517.
    While this standard of review ordinarily is "not
appellant-friendly,"  Lussier v. Runyon, 50 F.3d 1103, 1111 (1st
Cir. 1995), it does not render trial court decisions impervious to
scrutiny.  On abuse-of-discretion review, we will reverse a trial
court's decision if we determine that the judge "committed a
meaningful error in judgment."  Anderson v. Cryovac, Inc., 862 F.2d
910, 923 (1st Cir. 1988); see also Foster v. Mydas Assocs., Inc.,
943 F.2d 139, 143 (1st Cir. 1991) (explaining that an abuse of
discretion occurs "when a material factor deserving significant
weight is ignored, when an improper factor is relied upon, or when
all proper and no improper factors are assessed, but the court
makes a serious mistake in weighing them") (quoting Independent Oil
& Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864
F.2d 927, 929 (1st Cir. 1988)).
                         E.  Analysis.
    To determine whether the nisi prius court committed "a
meaningful error in judgment" here, we assay its evaluation of each
contested piece of evidence under the Daubert standard.
    1.  The Dosage Testimony.  We first consider the
exclusion of Dr. O'Donnell's testimony concerning the approximate
time of Ruiz's cocaine consumption and the amount of cocaine
actually ingested by him.  Based on autopsy data   cocaine and
cocaine metabolites found in Ruiz's blood, urine, nasal passages,
and vitreous humor   and half-life values for the substances
involved, Dr. O'Donnell applied a mathematical formula and
concluded "with reasonable pharmacological certainty" that Ruiz
"'snorted' at least 200-mg of cocaine powder into his nose thirty
(30) to sixty (60) minutes prior to the accident."  Although Dr.
O'Donnell's report cites numerous scientific writings in support of
the methodology underlying this proposition, the lower court found
none of these sources adequate to imbue the proffered opinions with
the patina of reliability required by Daubert.
    We have read the articles mentioned by Dr. O'Donnell and
supplied to the district court.  Several of them discuss a half-
life for cocaine or its metabolites and/or the times after
ingestion at which cocaine and its metabolites reach peak
concentrations in the body.  One of these sources is a standard
medical textbook.  See Matthew J. Ellenhorn & Donald G. Barceloux,
Medical Toxicology 648-49 (1988) (placing half-life in blood plasma
for cocaine administered intransally at 1.3 hours and citing the
average half-life for such cocaine in urine at 75 minutes).  
Another is a published article in a prestigious, peer-reviewed
medical journal.  See Peter M. Marzuk, et al., Fatal Injuries After
Cocaine Use As a Leading Cause of Death Among Young Adults in New
York City, 332 New Eng. J. Med. 1753, 1754 (1995) (using half-life
of cocaine metabolites in urine to determine use of cocaine by
victims of fatal car accidents).  The publication of these pieces
and their exposure to peer review serve as independent indicia of
the reliability of the half-life technique.  By the same token,
publication and peer review also demonstrate a measure of
acceptance of the methodology within the scientific community.
    Secondary sources cited by Dr. O'Donnell lack publication
and peer review, see, e.g., Daniel S. Isenschmid, Cocaine (Plasma
Concentrations of Cocaine Metabolites in Humans) 11-12 (collecting
and reporting studies finding half-lives for cocaine metabolites in
urine and peak levels of cocaine in plasma after intranasal
administration of cocaine), but this circumstance does not make
such sources per se unacceptable, see Daubert, 509 U.S. at 593
(explaining that neither publication nor peer review is "a sine quanon of admissibility").  Under ordinary circumstances, an
unpublished, unreviewed work, standing alone, probably would be
insufficient to demonstrate the reliability of a scientific
technique.  But when such an article makes the same point as
published, peer-reviewed pieces, it tends to strengthen the
assessment of reliability.
    Other works referenced by Dr. O'Donnell detail controlled
studies correlating dosages with levels of cocaine (and its
metabolites) remaining in the body after certain periods of time.  
See, e.g., Randall C. Baselt & Robert H. Cravey, Disposition of
Toxic Drugs and Chemicals in Man 208-09 (1989) (collecting
studies); H.E. Hamilton, et al., Cocaine and Benzoylecgonine
Excretion in Humans, 22 J. Forensic Sci. 697, 698-706 (1987)
(reporting results of a study that administered cocaine
intranasally to healthy subjects and tested urine for levels of
cocaine and its metabolites after 1, 2, 4, 8, 12, 24, 48, 72, 120,
144, and 168 hours).  These manuscripts further confirm the
reliability of Dr. O'Donnell's approach by providing information
that can be used to test the accuracy of the technique upon which
he relied.  And, finally, the fact that the plaintiffs' expert
employed essentially the same technique furnishes added validation.
    To be sure, the scientific literature does not make out
an open-and-shut case.  In defense of the trial court's ruling, the
plaintiffs point to statements (some of which appear in works
referenced by Dr. O'Donnell) that the half-life of cocaine varies
among individuals due to many factors, and that cocaine metabolites
can be found in the body days after ingestion.  See, e.g.,
Ellenhorn & Barceloux, supra at 649 (stating that the half-life of
cocaine in urine "varies significantly between individuals");
Hamilton, et al., supra, at 703 (finding cocaine metabolites in
subjects' urine up to 120 hours after insufflation of cocaine).  
The plaintiffs posit that these statements indicate the inherent
unreliability of Dr. O'Donnell's dosage opinion.  If half-life
varies, they ruminate, it cannot be used to determine initial
dosage with any accuracy   and the discovery of metabolites offers
no more information because these may remain in the body long after
the drug's effects on behavior have subsided.  Thus, the plaintiffs
asseverate, Daubert forbids the admission of Dr. O'Donnell's
testimony.
    We think that the plaintiffs (and the district court) set
the bar too high.  Although the statements that they assemble cast
doubt on Dr. O'Donnell's position   for example, those statements
suggest that the half-life technique for calculating dosage has an
uncertain rate of error   no single factor disposes of a
reliability inquiry.  See Daubert, 509 U.S. at 592-95.  Dr.
O'Donnell's technique has been subjected to, and survived, the
rigors of testing, publication, and peer review, and it appears to
have won significant (if not universal) acceptance within the
scientific community.  Daubert does not require that a party who
proffers expert testimony carry the burden of proving to the judge
that the expert's assessment of the situation is correct.  As long
as an expert's scientific testimony rests upon "good grounds, based
on what is known," Daubert, 509 U.S. at 590 (internal quotation
marks omitted), it should be tested by the adversary process   
competing expert testimony and active cross-examination   rather
than excluded from jurors' scrutiny for fear that they will not
grasp its complexities or satisfactorily weigh its inadequacies,
see id. at 596.  In short, Daubert neither requires nor empowers
trial courts to determine which of several competing scientific
theories has the best provenance.  It demands only that the
proponent of the evidence show that the expert's conclusion has
been arrived at in a scientifically sound and methodologically
reliable fashion.  See Kannankeril v. Terminix Int'l, Inc., 128
F.3d 802, 806 (3d Cir. 1997); In re Paoli R.R. Yard PCB Litig., 35
F.3d 717, 744 (3d Cir. 1994).
    On balance, we find that Dr. O'Donnell's dosage opinion,
incorporating a range of time in which he believed Ruiz took the
cocaine, satisfies this standard.  The opinion was premised on an
accepted technique, embodied a methodology that has significant
support in the relevant universe of scientific literature, and was
expressed to a reasonable degree of pharmacological certainty.  
While the literature does not irrefutably prove the accuracy of Dr.
O'Donnell's dosage conclusions, it furnishes a sufficient
underpinning for those conclusions to forfend preclusion of his
testimony as unreliable.  Thus, the district court's refusal to
entertain Dr. O'Donnell's dosage opinion constituted an abuse of
discretion.  See Baker, 156 F.3d at 252-54; see also Ed Peters
Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 258-61 (1st Cir.
1997) (finding, prior to Joiner, exclusion of expert testimony
erroneous under either abuse of discretion or a more stringent
standard of review).
    2.  The Impairment Testimony.  Although Dr. O'Donnell's
opinion on dosage contained sufficient indicia of reliability to
warrant its admission into evidence, the defendants needed other
expert evidence to flesh out their theory as to how the accident
occurred.  In particular, they had to show a correlation between
cocaine use in the dosage suggested by Dr. O'Donnell's opinion and
an impairment affecting the cocaine user's fitness to drive.  Dr.
O'Donnell was ready to supply the missing link:  he opined that
cocaine intoxication resulting from a dose such as Ruiz insufflated
results in impairments of perception, reflexes, reaction time, and
judgment, and that such a degree of intoxication increases one's
"sense of mastery" and thus promotes risk taking.  Virtually all of
these sequelae would adversely affect the ability to drive safely.
    The plaintiffs urged the trial court to hold that Dr.
O'Donnell's impairment testimony failed Daubert's reliability prong
because science cannot correlate particular impairments to cocaine
concentrations within the body.  See, e.g., Peter M. Marzuk, et
al., Prevalence of Recent Cocaine Use Among Motor Vehicle
Fatalities in New York City, 253 J. Am. Med. Ass'n 250, 255 (1990).  
In the plaintiffs' view, only an immediate neurological examination
could have provided sufficiently reliable evidence as to whether
Ruiz suffered from cocaine intoxication at the time of the accident
(and if so, to what extent)   and no such examination was
performed.
    The court granted the plaintiffs' motion to exclude the
impairment testimony.  We quote the core of the court's reasoning,
as explicated in its subsequent denial of the defendants' motion
for a new trial:
    All the scientific literature submitted to the
    Court on this issue unanimously concluded that
    unlike alcohol, a correlation between a
    particular amount of cocaine in the system and
    the degree of impairment produced has not been
    scientifically determined because the effects
    of this substance var[y] from one individual
    to another.  Thus, from the scientific
    evidence reviewed by the Court it was
    concluded that even though it is generally
    accepted that cocaine causes impairment in an
    individual [it] cannot be scientifically
    deduced from the amount found in his or her
    system because persons metabolize cocaine
    differently.

    We believe that the court's rationale conflated the
dosage and impairment issues.  The court agreed that "cocaine
causes impairment," but rejected Dr. O'Donnell's proposed testimony
on this point because of its distrust of the witness's dosage
testimony.  By relying so heavily on an improper factor in the
decisional calculus   the dosage testimony, as we have said, was
sufficiently reliable to satisfy Daubert   the district court
abused its discretion.  See Foster, 943 F.2d at 143; Independent
Oil Workers, 864 F.2d at 929.
    To compound this error, the court applied a standard of
scientific certainty to the impairment testimony beyond that which
Daubert envisions.  The court imposed a threshold requirement that
science be able to declare that a precise quantity of cocaine in
the bloodstream produces an equally precise degree of impairment.  
This requirement solicits a level of assurance that science
realistically cannot achieve and that Daubert does not demand.  SeeDaubert, 509 U.S. at 590 (commenting that "arguably, there are no
certainties in science").  The adoption of such a standard
impermissibly changes the trial judge's role under Daubert from
that of gatekeeper to that of armed guard.  That mistaken
application of the law likewise constitutes an abuse of discretion.  
See United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998)
(holding that a per se abuse of discretion occurs when a district
court commits an error of law).
    3.  The Remaining Evidence.  Having decided to ban Dr.
O'Donnell's proffered testimony, the district court held that the
prejudicial effect of admitting the toxicology results would
substantially outweigh their probative value and excluded this
evidence under Rule 403.  This is perfectly understandable:  to
allow the jury to be told that traces of cocaine were found in
Ruiz's body without any accompanying explanation of the meaning of
the test results or of cocaine's capacity to impair driving skills
would sow the seeds for an horrific harvest.  It is evident,
however, that the lower court's rulings regarding the admissibility
of Dr. O'Donnell's proffered testimony influenced the calibration
of the Rule 403 balance.  The error inherent in those rulings
requires vacation of this aspect of the district court's order vis-
-vis the toxicology results.
    The district court's prohibition of Cintrn's causation
opinion also must be reconsidered.  Cintrn's proposed testimony as
to cocaine's role in the accident was based on other evidence
(e.g., the toxicology results) that the district court erroneously
excluded.  This bevue nullifies the most obvious reason for
precluding Cintrn from testifying anent causation.  As with the
toxicology results, this ruling will have to be revisited by the
district court on remand.
                   F.  Effect of the Errors.
    Our odyssey is not yet concluded.  The plaintiffs contend
that even if the trial court erred in excluding evidence anent
Ruiz's use of cocaine, the mistakes are harmless and do not require
a new trial.  See Fed. R. Civ. P. 61; Fed. R. Evid. 103.
    The plaintiffs' argument is not without some force.  
Puerto Rico is a comparative negligence jurisdiction that imposes
joint and several liability on joint tortfeasors.  This doctrinal
combination means that a driver whose negligence is found to have
contributed to causing an accident may be solely responsible for
compensating the victims even though the other driver involved in
the accident was more negligent.  See generally Ramos Acosta, 116
P.R. Offic. Trans. at 81-82.
    In this case, the district court properly directed the
jury to make findings anent comparative negligence, and the jury
assigned fault to both drivers (59% to Ruiz, 41% to Hernndez).  
The plaintiffs maintain that the evidence of cocaine use was
relevant only to Ruiz's negligence and that its prohibitation did
not undermine the jury's finding that Hernndez's negligence
contributed significantly to the accident's occurrence.  Since
Hernndez's negligence subjects the defendants to liability for the
full amount of the verdict, see supra note 1, the plaintiffs
hypothesize that the improper exclusion of the cocaine evidence
does not require a new trial.  We reject this hypothesis.
    The draconian potential of the Puerto Rico rules is
mitigated by the theories of efficient cause and absorption.  Under
the principle of efficient cause, when one party is the "sole, and
efficient cause of the damage," another's negligence during the
accident, if it did not cause it, does not subject him to
liability.  Toro Lugo v. Ortiz Martnez, 113 P.R. Offic. Trans. 73,
75, 113 P.R. Dec. 56, 56 (1982).  Under the absorption theory, if
one tortfeasor is only slightly responsible, the overwhelming
negligence of the other tortfeasor "absorbs" the minimal negligence
of the former and the latter bears all liability.  See id.; seealso Santiago v. Becton Dickinson & Co., 571 F. Supp. 904, 911-14
(D.P.R. 1983) (comparing efficient cause and absorption
principles).
    These theories have particular pertinence here. Ruiz's
alleged cocaine intoxication formed the foundation not only for the
defendants' insistence that Ruiz was guilty of negligence, but also
for their insistence that Hernndez was not negligent.  With the
benefit of the cocaine evidence, the jurors may well have balanced
the proofs of negligence quite differently.  After all, they found
Ruiz 59% negligent even without the damaging evidence suggesting
that his judgment and driving ability may have been impaired by
cocaine at the time of the crash.  The additional evidence, if
ultimately shown to be admissible, easily could lead a rational
jury to find Ruiz's negligence to have been so great as to
overwhelm Hernndez's negligence.
    An erroneous evidentiary ruling requires vacation of a
jury verdict if the ruling excludes evidence and "the exclusion
results in actual prejudice because it had a substantial and
injurious effect or influence in determining the jury's verdict."  
United States v. Shay, 57 F.3d 126, 134 (1st Cir. 1995) (citation
and internal quotation marks omitted).  In order to determine
whether a particular ruling had a sufficiently pernicious effect on
a verdict, a reviewing court must resist the temptation to deal in
abstractions, and must mull the ruling in context, giving due
weight to the totality of the relevant circumstances.  See Nieves-
Villanueva v. Soto-Rivera, 133 F.3d 92, 102 (1st Cir. 1997).  To
sustain the verdict, the reviewing court must be able to say with
a fair degree of assurance that the erroneous ruling did not
substantially sway the jury.  See Ladd, 885 F.2d at 957 (citing
Kotteakos v. United States, 328 U.S. 750, 765 (1946)).  We can
muster no such assurance here.
    We reach this conclusion despite the somewhat awkward
procedural posture in which this appeal arises.  In the
prototypical "exclusion of evidence" case, the court of appeals
assesses the effect that a piece of evidence, wrongly withheld from
the jury, likely would have had if introduced.  See, e.g.,
Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 5-9 (1st Cir. 1994).  
This case is different.  Even with the misplaced Daubert obstacle
removed, the dosage testimony is not necessarily admissible.  
Rather, its admissibility depends to some extent upon whether
certain other evidence, specifically, the toxicology results and
the impairment testimony, prove to be admissible.  Without the
former (to establish the basis for Dr. O'Donnell's dosage opinion)
and the latter (to explain the probable effects of Ruiz's cocaine
use on his driving), the dosage testimony, though deemed reliable
in the Daubert sense, might not be admissible in the long run.  
Yet, when a trial court erroneously excludes evidence, and the
exclusion meets the standard criteria of harmfulness, the harm is
not cured by a mere possibility that other appropriate grounds for
exclusion of the same evidence may later be found to exist.  The
question is one of degree and the choice of remedies (including
whether to require a new trial or merely remand for further
findings) is ours.  See 28 U.S.C.  2106.
    In this instance, we think that the defendants' chances
of succeeding in their effort to introduce the cocaine-related
evidence are promising enough that the improper exclusion of the
dosage testimony, coupled with the errors regarding the court's
consideration of the impairment testimony, can be said to have
materially curtailed the defendants' opportunity to present their
theory of the case to the jury.  This, in turn, worked a
substantial and injurious effect on the jury's ability to evaluate
liability.  Taking into account all aspects of the situation, we
are persuaded that vacation of the judgment, rather than a remand
for further findings, is the fairest course.  A new trial will
allow a judge appropriately to ascertain the admissibility of
expert testimony and a jury armed with all reliable and relevant
evidence to weigh issues of comparative fault on a scale that is in
balance.  To this end, we reject the plaintiffs' claim that any
error committed by the trial court was benign.
III.  CONCLUSION
    We need go no further.  By excluding Dr. O'Donnell's
dosage testimony, the district court exceeded the scope of its
discretion under Daubert.  This fundamental error infected certain
other evidentiary rulings.  On the facts of this case, there is too
great a risk that these rulings, in cumulation, had a substantial
and injurious influence upon the jury's determinations.  Hence, we
reverse the district court's Daubert ruling, vacate the judgment
below, and order a new trial.  We emphasize that, in doing so, we
hold only that the dosage testimony is sufficiently reliable to be
admissible.  We do not pass upon the ultimate admissibility of that
evidence (which, as we have said, depends upon the admissibility of
the toxicology results, see supra note 7, and the admissibility of
the correlative impairment testimony).  By like token, we do not
pass upon the ultimate admissibility of either the impairment or
causation testimony.  That evidence must be reexamined within the
limits dictated by Daubert and its progeny.

Reversed and remanded for a new trial.

</body>

</html>